UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:05-cr-37 |
| | ) | *Edgar* |
| TYSHAWN HILL and | ) | |
| RONDRELL SANFORD | ) | |

**MEMORANDUM**

Defendants Tyshawn Hill ("Hill") and Rondrell Sanford ("Sanford") move to suppress from use at trial all evidence seized as a result of the search of Hill's vehicle on February 25, 2005. [Doc. Nos. 30, 32]. The Court held an evidentiary hearing on May 26, 2005. After hearing the proof and oral argument from the parties, the Court concludes that the motions to suppress will be **DENIED**.

**I.** **Facts**

On February 25, 2005, McMinn County, Tennessee, Sheriff's Department Deputy Kenneth Pruitt was driving North on Interstate 75 behind a 2001 Buick Regal at about 65 mph. The speed limit at this location was 70 mph. Pruitt observed that the driver of the Buick intended to pass a slower moving tractor trailer rig, when he was prevented from doing so by a van proceeding in the left lane. The Buick driver had, during this process, come to a point about only ten feet behind the tractor trailer rig. Pruitt turned on his blue lights and stopped the Buick, which was being driven by defendant Hill. Defendant Sanford was riding in the front passenger seat. Pruitt noted that the Buick had New York license plates. The reason for the stop was a traffic violation for following too closely. *See* Tenn. Code Ann. § 55-8-124.

Pruitt parked his patrol car behind the Buick and approached the driver's side door. He requested a driver's license along with the automobile registration and proof of insurance. Hill handed him this information.[1] While he was talking to Hill, Pruitt noticed about fifteen air fresheners hanging on the directional signal lever coming out of the steering column. He knew from his law enforcement experience that drug traffickers commonly used these air fresheners to throw drug detection dogs off the scent of drugs. Pruitt was himself a dog handler and had a dog with him in his patrol car.

Pruitt then asked Sanford for some identification, but Sanford was unable to provide any. Sanford's inability to do so provided a further bit of suspicion, because in Pruitt's experience people usually carry some form of identification. At this point Pruitt decided to question the two separately and asked Hill to exit the vehicle. At the rear of the Buick Pruitt engaged Hill in conversation. Pruitt informed Hill of the reason for the traffic stop, and Hill did not deny that he had been following too closely.[2] When asked the identity of his passenger, Hill was only able to provide a nickname—"T." Hill advised that they had been in Atlanta. When Pruitt asked what Atlanta had that New York did not have, the reply, in some detail, was that he, along with five others, including the passenger, had been to an Atlanta Hawks NBA basketball game. Hill said that he was able to get six tickets, and he expressed some frustration with the Hawks.

Pruitt then questioned Sanford, who was still sitting in the passenger seat of the vehicle. Sanford likewise did not know Hill's name. Sanford said that he only knew Hill by his

---

[1] The "license" that Hill provided was really a "learner's permit," but Pruitt did not notice this at the time.

[2] Eventually Pruitt gave Hill a citation for the traffic violation. This citation apparently now lies unresolved because of the charges in this case.

-2-

nickname—"T-money." Needless to say, the fact that neither passenger knew the other except via nicknames only added to Pruitt's suspicions that something was "not right." The nail in the coffin, however, was added when Sanford also said that they had been in Atlanta, but that they were there to find "women." Sanford, who did supply his real name, said that his favorite NBA team is the New York Knicks and that he had not been to an NBA game in a couple of years. This, of course, was quite a different story than that provided by Hill.

Suspicious, Officer Pruitt returned to his car to call for back-up and check Hill's license and vehicle tag information. Officer Johnson, along with his narcotics-detection dog, arrived within approximately four minutes. Shortly thereafter Pruitt received a response verifying Hill's license and tag information.

At this point Pruitt asked Hill if he had any problem with the officers searching the Buick. Hill responded that he had no such problem and that "he had nothing to hide." Pruitt patted down Hill and found several cell phones and a pager, along with a roll of $20 bills with two black bands around them. Pruitt then requested Sanford exit the vehicle and patted down Sanford. Upon feeling a bulge in a trouser pocket Pruitt asked Sanford if the bulge was marijuana. Sanford responded that indeed it was. Pruitt stayed with Hill and Sanford while Johnson began a search of the Buick.

Hill and Sanford were told to stand with Pruitt in the space between the Buick and the patrol car while Officer Johnson began the search with his drug dog. Three times Hill started to move towards the Buick, saying that he was only going to help Officer Johnson open the glove box. Because of Hill's actions Pruitt had the defendants move to the front "push block" of the patrol car. Pruitt observed the two from inside the patrol car. His purpose was to note their reaction to the

search. When Officer Johnson reached the door to the back seat behind the driver, Hill bolted across the Interstate and ran. Pruitt chased him for a short while to no avail.

When Pruitt returned to the scene, Officer Johnson ran his drug dog around the Buick, and it alerted on the rear seat area of the Buick, as did Pruitt's dog. The officers found a suitcase there containing eight bricks of cocaine hydrochloride. Following this discovery the officers and their dogs tracked Hill through the countryside where officers finally apprehended him.

## II.   Analysis

Hill and Sanford seek to suppress from use at trial the cocaine hydrochloride discovered in the backseat of Hill's Buick. At the hearing on this motion, Sanford argued only one ground for suppressing the evidence: that the traffic stop of the vehicle was unconstitutional. In his motion Sanford asserted two additional grounds: that Officer Pruitt did not have reasonable suspicion to warrant a prolonged detention; and that the detention became an arrest for which Pruitt did not have probable cause. [Doc. No. 32]. At the hearing Hill asserted the same three arguments, plus an additional ground: that he did not consent to the search of his car, and even if he did, his consent was not voluntary. The Court finds that none of these arguments warrant suppressing the evidence.

### A. Traffic Stop of Hill's Vehicle

Officers may temporarily stop a vehicle and detain its passengers where it is not "'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *accord United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citations omitted); *accord Copeland*, 321 F.3d at 592. Probable cause will be insufficient, however, when the circumstances involve "searches

-4-

or seizures conducted in an extraordinary manner," such as "seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Whren*, 517 U.S. at 818; *accord Copeland*, 321 F.3d at 592 n.3. Such situations do not exist here, so Officer Pruitt's stop of Hill's vehicle was reasonable if based upon probable cause to believe that Hill committed a traffic violation.

Probable cause is defined as "'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Copeland*, 321 F.3d at 592 (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)). Whether an officer had probable cause to stop a vehicle depends on "the totality of the circumstances from the perspective of the officer at the time of the incident," not what he discovers after the stop. *Id.* (citing *Ferguson*, 8 F.3d at 391).

Here, Officer Pruitt had probable cause to believe that Hill committed a traffic violation. While driving behind Hill's Buick, Pruitt watched Hill violate Tenn. Code Ann. § 55-8-124, which prohibits drivers from following another vehicle too closely. Pruitt witnessed Hill get within ten feet of a tractor trailer rig while traveling at 65 mph. Accordingly, the Court finds that Pruitt had probable cause to believe Hill committed a traffic violation, justifying the stop of Hill's vehicle.

Neither Hill nor Sanford argue that Hill did not get within ten feet of the tractor trailer rig. In fact, when Pruitt informed Hill of the traffic violation Hill did not deny that he approached within ten feet of the rig. Instead, both Hill and Sanford argue that coming within ten feet of the rig does not constitute a traffic violation in these circumstances. Specifically, Hill only came so close to the rig because Hill was trying to pass the rig but was prevented by a van in the left lane. Officer Pruitt witnessed these circumstances but decided that they did not warrant coming within ten feet of the

rig while traveling at 65 mph. The Court agrees. Officer Pruitt's traffic stop of Hill's vehicle was constitutional.

## B. Detention after the Traffic Stop

Hill and Sanford argue that their detention was unconstitutional in two ways: first that Officer Pruitt did not have reasonable suspicion to justify their detention; and second that the prolonged detention became an arrest for which Officer Pruitt did not have the requisite probable cause. Both arguments are unpersuasive.

"[A]s soon as the purpose of a traffic stop has been accomplished, an officer cannot further detain the vehicle or its occupants unless facts occur which would generate reasonable suspicion to justify further detention." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (citing *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995)). "[T]he subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). "To determine whether a detention is reasonable, the court should consider 'whether the officer's action was justified at its inception, and whether it is reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Berkemer*, 468 U.S. at 439 (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968))). "[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" *Id.* (quoting *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996)).

Here, the Court finds that Pruitt's detention of Hill and Sanford was based on reasonable suspicion and, therefore, constitutional. Upon approaching the Buick after the traffic stop, Officer Pruitt observed approximately fifteen air fresheners hanging from the directional signal lever coming

out of the steering column. From his law enforcement experience, Pruitt knew that drug traffickers commonly use these air fresheners to throw drug detection dogs off the scent of drugs. Further arousing Pruitt's suspicion, Sanford was unable to produce any identification when Pruitt requested such. In an effort to investigate his suspicions, Pruitt separated the two for minimal questioning. From his questions, Pruitt received two widely conflicting reasons for the trip to Atlanta and learned the neither of the two knew the other's name. The detention continued for approximately four minutes while Pruitt awaited back-up and checked Hill's license and tag information. Pruitt then requested and received consent to search the vehicle and patted down Hill and Sanford, discovering marijuana in Sanford's pocket. Officer Johnson and his drug dog then began to search the vehicle. The Court finds that each of Pruitt's actions was reasonable given the totality of the circumstances at the time. Pruitt had reasonable suspicion justifying the detention of Hill and Sanford.

Further, the Court finds that the detention of Hill and Sanford did not become an arrest requiring probable cause. "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant[s]." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Here, Officer Pruitt pursued a means of investigation that was likely to confirm or dispel his suspicions quickly. Pruitt's suspicions were aroused by the fifteen air fresheners hanging from the directional signal and Sanford's inability to produce any identification. In an effort to confirm or dispel his suspicions, Pruitt separated the two to question each individually. Officer Pruitt's suspicions were quickly confirmed when he received, via this questioning, conflicting reasons for the trip to Atlanta and learned the neither knew the other's name. Once back-up arrived, Pruitt

requested and received consent to search the vehicle, patted down both Hill and Sanford, and discovered marijuana in Sanford's pocket, further confirming his suspicions. Pruitt's suspicions were further confirmed when the officers discovered eight bricks of cocaine hydrochloride in the vehicle. The Court finds that Officer Pruitt diligently pursued a means of investigation that would quickly confirm or dispel his suspicions. Accordingly, the detention of Hill and Sanford did not become an arrest.

### C. Consent to the Vehicle Search

Hill also argues that the Court should suppress the evidence seized in this case because he did not voluntarily consent to the search of the vehicle. Sanford does not raise this argument, nor any other argument challenging the search of Hill's vehicle, because he does not have standing to do so. *See Rakas v. Illinois*, 439 U.S. 128, 144 (1978); *United States v. Carter*, 14 F.3d 1150, 1153-55 (6th Cir. 1994); *United States v. Pino*, 855 F.2d 357, 360-61 (6th Cir. 1988)

A search is valid if conducted pursuant to a person's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004); *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998). When the Government relies "'upon consent to justify the lawfulness of a search, [the government] has the burden of proving that the consent was, in fact, freely and voluntarily given.'" *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). The consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)).

The Court finds that Hill consented to the search of the car. According to the only evidence presented at the suppression hearing—the testimony of Officer Pruitt—when Officer Pruitt asked

-8-

Hill if Hill had a problem with Officer Pruitt searching the car, Hill replied that he had no such problem and that he had nothing to hide. Hill's response indicates his consent to the search of the vehicle. That Hill consented to the search is buttressed by his actions during the search. When Officer Johnson was searching the front passenger area of the vehicle, Hill approached the car offering to help Officer Johnson open the glovebox. Hill's efforts to assist Officer Johnson in his search of the vehicle only reinforce Hill's consent to the search.

Further, the Court finds that Hill's consent was voluntary. "[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied is a question of fact to be determined from the totality of the circumstances." *Schneckloth*, 412 U.S. at 227; *accord Carter*, 378 F.3d at 587 (citing *Schneckloth*). In making this determination, the following factors are to be considered:

> First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; and whether the individual understands his or her constitutional rights. . . . Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police . . . and indications of more subtle forms of coercion that might flaw an individual's judgment.

*United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citations and quotations omitted); *accord United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002); *Worley*, 193 F.3d at 386.

In considering these factors in the instant case, the Court finds that Hill freely and voluntarily consented to the search of the car. At approximately thirty (30) years of age, Hill cannot be said to be unusually vulnerable to coercion due to youth or old age. According to Officer Pruitt, Hill was not under the influence of alcohol or drugs. There is no evidence regarding Hill's intelligence or education, but there is no indication that Hill failed to understand the officer's request to search the

car. There was no lengthy detention or interrogation. The officers did not use coercive or punishing tactics in seeking consent. The encounter occurred in a public place, on the side of a public street. Based on these facts, the Court finds that Hill freely and voluntarily consented to the search of the car.

Even assuming Hill did not consent, the search of the vehicle was nonetheless constitutional. For even absent consent, officers can conduct a warrantless search of a vehicle if there exists probable cause to believe that the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Ross*, 456 U.S. 798, 799 (1982). And here, Officers Pruitt and Johnson had probable cause to search the vehicle. Upon requesting Sanford to exit the vehicle, Officer Pruitt conducted a pat-down search of Sanford and discovered marijuana in Sanford's pocket. Additionally, before searching the vehicle Officer Johnson and Officer Pruitt escorted their drug dogs around the vehicle, and both alerted to drugs in the car. When such a dog alerts to the smell of drugs in a vehicle, probable cause exists to search the vehicle. *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999); *accord United States v. Jacob*, 377 F.3d 573, 580 n.5 (6th Cir. 2004). By discovering marijuana in Sanford's pocket and based on the dogs alerting to the vehicle, the officers had probable cause to believe the vehicle contained contraband, justifying the search of Hill's vehicle even absent Hill's consent.

Finally, the Court notes an additional justification for the search of Hill's vehicle. Upon conducting a pat-down search of Sanford and discovering marijuana in Sanford's pocket, Officer Pruitt could have arrested Pruitt and searched the car incident to a lawful arrest pursuant to *New York v. Belton*, 453 U.S. 454 (1981). For "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the

passenger compartment of the automobile." *Belton*, 453 U.S. at 460.  The Court finds that Officer Pruitt's search of Hill's vehicle was constitutional.

Hill's and Sanford's respective motions to suppress the evidence seized during the search of Hill's vehicle [Doc. Nos. 30, 32] will be **DENIED**.  A separate order will enter.

*/s/ R. Allan Edgar*
R. ALLAN EDGAR
CHIEF UNITED STATES DISTRICT JUDGE
